FILED

2012 FEB 15  PM 4: 05

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY_____

1    Marc L. Godino (182689)
2    mgodino@glancylaw.com
     GLANCY BINKOW & GOLDBERG LLP
3    1925 Century Park East, Suite 2100
4    Los Angeles, CA 90067
     Tel: (310) 201-9150, Fax: (310) 201-9160
5
6    Karin E. Fisch (*Pro Hac Vice to be filed*)
7    kfisch@abbeyspanier.com
     Stephanie Amin-Giwner (*Pro Hac Vice to be filed*)
8    samin@abbeyspanier.com
9    ABBEY SPANIER RODD & ABRAMS, LLP
     212 East 39th Street
10   New York, New York 10016
11   Tel:  (212) 889-3700, Fax:  (212) 684-5191

12
     Attorneys for Plaintiff and the Class
13
14              UNITED STATES DISTRICT COURT
15            CENTRAL DISTRICT OF CALIFORNIA
16
                                    CV 12  1336-ODW
17
                                         (AJW)
     LYNETTE BATES, on behalf of herself     Case No.
18   and all others similarly situated,
19                                           **CLASS ACTION COMPLAINT**
                    Plaintiff,
20                                           **JURY TRIAL DEMANDED**
21                    v.
22   GENERAL NUTRITION CENTERS,
23   INC., CELLUCOR SPORTS
     NUTRITION, WOODBOLT                     **COPY**
24   DISTRIBUTION, LTD., WOODBOLT
25   MANAGEMENT, LLC and
     WOODBOLT INTERNATIONAL,
26
27                  Defendants.
28

1   Plaintiff, Lynette Bates, by and through her attorneys, bring this class action
2
3   on behalf of herself, and a class of all other similarly situated persons defined below
4   (the "Class") against General Nutrition Centers, Inc. ("GNC"), Cellucor Sports
5   Nutrition ("Cellucor"), Woodbolt Distribution, Ltd ("Woodbolt Distribution"),
6
7   Woodbolt Management LLC ("Woodbolt Management"), and Woodbolt
8   International.   Plaintiff brings this action for injunctive, declaratory and
9   compensatory relief for violation of the California consumer protection laws, breach
10
11   of express warranty, breach of implied warranty and unjust enrichment.   Plaintiff
12   alleges matters pertaining to herself and her own acts upon personal knowledge, and
13
14   as to all other matters upon information and belief, based upon the investigation
15   undertaken by counsel, as follows:
16
17                            **JURISDICTION AND VENUE**
18       1.   This Court has jurisdiction over the subject matter presented by this
19   complaint because it is a class action arising under the Class Action Fairness Act of
20
21   2005, Pub. L. No.109-2, 119 Stat. 4 (2005) ("CAFA").   Under CAFA, the federal
22   courts have jurisdiction of a class action in which there is diversity of citizenship,
23
24   the amount in controversy exceeds $5,000,000 in the aggregate, excluding interest
25   and costs, and more than two-thirds of the class members are from a state other than
26   the state in which the action is being brought and there are more than 100 members
27
28   of the proposed class.

CLASS ACTION COMPLAINT                                                    Page 2

2.     As required by CAFA and 28 U.S.C. § 1332(d)(2)(A), the parties are diverse since Plaintiff is a citizen of the State of California, defendant GNC is a citizen of the State of Delaware and the other defendants are all citizens of the State of Texas.

3.     The total claims of the class members exceed $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332 (d) (2) (5). Over two-thirds of the class members are citizens of states other than California, as required by 28 U.S.C. §1332(d)(5)(B), and there are well over 100 members of the proposed class.

4.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(a) and (c) since Plaintiff resides in this District and all defendants do business in this District. Each of the Defendants has promoted, marketed, distributed and/or sold Cellucor C-4 Extreme ("C-4 Extreme") in this District.

## SUMMARY OF THE ACTION

5.     This action arises out of Defendants' illegal and deceptive practice of promoting, marketing, distributing and/or selling purported dietary supplements which, unknown to Plaintiff and other consumers, contain a dangerous substance known by many names, including "1,3 Dimethylamylamine," "1, 3 Dimethylhexaneamine HCL," "1,3 Dimethylhexaneamine" "Methylhexaneamine," and "Geranamine" (hereinafter referred to as "DMAA"). Although Defendants

contend that DMAA is derived from the geranium plant or is a "natural" product entitling them to sell it as a "dietary supplement" rather than a "drug," the DMAA contained in C-4 Extreme is wholly synthetic, manufactured, and not derived from the geranium plant.  At the time Plaintiff purchased and used C-4 Extreme, she was unaware C-4 Extreme contained the synthetic and dangerous stimulant, DMAA, and/or that DMAA was actually a drug and/or that DMAA was not natural in that it is not derived from the geranium plant or other natural source.

## PARTIES

6.    Plaintiff Bates is a resident of Los Angeles, California.  Plaintiff purchased C-4 Extreme on June 30, 2011 at a GNC store in San Jose, California. The C-4 Extreme product purchased by Plaintiff Bates contained DMAA.

7.    Defendant GNC is a corporation organized and existing under the laws of the State of Delaware, with its principal executive offices at 300 Sixth Avenue, Pittsburgh, Pennsylvania 15222.  It is a holding company that conducts all of its operations through its operating subsidiaries.  GNC is the largest nationwide specialty retailer of vitamin, mineral and herbal supplements, sports nutrition products, as well as many personal care and related products, with retail stores in all 50 states.  Its Form 10-K for the year ended December 31, 2010, filed with the Securities and Exchange Commission on February 25, 2011("10-K"), says that it has 2748 domestic company-owned retail locations and 903 franchises.  GNC,

through its company-owned stores and franchisees, transacts business in Pennsylvania at over 153 company-owned retail locations and 31 franchise locations throughout the State. GNC sells items under its private "GNC" Brand label, private label items manufactured by third party manufacturers, and third-party labeled and manufactured items. Through its self-described "sophisticated" distribution facilities, GNC's distribution fleet delivers both its own products and third-party products to GNC-owned and domestic franchise retail stores across the country via its distribution centers in Leetsdale, Pennsylvania; Anderson, South Carolina; and Phoenix, Arizona to GNC stores on a weekly or bi-weekly basis.

8. Defendant Cellucor is a company located at 715 North Main Street, Bryan, Texas 77803-3327. Cellucor manufactures, sells, promotes, markets and distributes a variety of dietary supplements, including C-4 Extreme, in California and across the United States. It was co-founded in 2002 by its current President, Robert Wood.

9. Defendant Woodbolt Distribution created in 2002, is a domestic limited partnership organized and existing under the laws of the state of Texas, with its principle executive offices at 715 North Main Street, Bryan, Texas 77803-3327. It manufactures, promotes, markets, sells and distributes C-4 Extreme in California and across the United States.

10. Defendant Woodbolt Management is a limited liability company organized and existing under the laws of the state of Texas, with its principle executive offices at 715 North Main Street, Bryan, Texas 77803-3327. It is the general partner of Woodbolt Distribution. It manufactures, promotes, markets, sells and distributes C-4 Extreme in California and across the United States.

11. Defendant Woodbolt International is also located at 715 North Main Street, Bryan, Texas 77803-3327 and is identified on the product package as the distributor of C-4 Extreme. It distributes Cellucor products such as C-4 Extreme, to over 3500 retail locations in the U.S., including in California.

12. Defendants Cellucor, Woodbolt Distribution, Woodbolt Management, and Woodbolt International are sometimes collectively referred to herein as "Cellucor".

## SUBSTANTIVE ALLEGATIONS

**DMAA is Not a "Dietary Supplement"**

13. Defendants promote, market, distribute and sell a variety of products labeled as dietary supplements, including C-4 Extreme. Defendants have claimed that C-4 Extreme is a dietary "supplement" that contains DMAA which, they contend, is a naturally-occurring substance derived from geranium stems, seeds or geranium oil. This is untrue.

14.   Studies have concluded that there is no DMAA whatsoever in geranium oil, that DMAA is not extracted from geranium oil, and that all DMAA on the market is synthetic.  Because DMAA is a wholly synthetic substance, it is not a "dietary ingredient" and C-4 Extreme is not, therefore, a "dietary supplement" as those concepts are defined by the applicable regulations promulgated by the U.S. Food & Drug Administration ("FDA").  Therefore, Defendants' marketing of C-4 Extreme as a dietary supplement is false and misleading.

15.   DMAA was patented by Eli Lilly & Company in 1944 and later marketed, under the trademark "Forthane" (the trademark has since has expired), for use as a nasal decongestant and as a treatment for hypertrophied or hyperplasic oral tissues.  Because DMAA was previously patented and marketed by Eli Lilly as a "drug" for the treatment of various medical conditions and disorders, it should remain classified as a drug because of its pharmaceutical actions, side effects, and dangers.

16.   Patrick Arnold, a chemist who went to jail as a result of his role in the ephedrine steroid scandal (ephedrine was banned by the U.S. in 2005), was instrumental in marketing a "dietary supplement" containing methylhexanamine in 2006.  Arnold introduced it as "Geranamine," a trademarked name being held by his company, Proviant Technologies.  Geranimine was sold over the Internet.

17.    Defendants' labeling, marketing and advertising fails to inform consumers that DMAA (a) is not a dietary ingredient; (b) is not a naturally occurring substance or derived from a naturally occurring substance; (c) is synthetic and manufactured in laboratories or similar facilities; (d) is a potentially dangerous central nervous system stimulant; and (e) that using C-4 Extreme can cause serious medical harm.

**Federal Law Prohibits the Sale of DMAA as a Dietary Supplement**

18.    In 1994, the Dietary Supplement Health and Education Act (DSHEA) was passed into law and radically changed the dietary supplement marketplace because it established a new framework governing the composition, safety, labeling, manufacturing and marketing of dietary supplements.  DSHEA expanded the category of dietary supplements and removed much of the FDA's control over those supplements.  As a result, a largely unregulated industry was created.

19.    Generally, under DSHEA, dietary ingredients that were marketed in the U.S. before October 15, 1994 may be used in dietary supplements without notifying the FDA.  Notice of "New" dietary ingredients (*i.e.*, those that were not marketed in the U.S. before October 15, 1994) must be submitted to the FDA unless the ingredient has been "present in the food supply as an article used for food" without being "chemically altered."  A new dietary ingredient notification must provide the FDA with evidence of a "history of use or other evidence of safety"

establishing that use of the dietary ingredient "will reasonably be expected to be safe." A new dietary ingredient notification must be submitted to the FDA at least 75 days before the initial marketing of that ingredient. The FDA may determine that a new dietary ingredient notification does not provide an adequate basis to conclude that a dietary ingredient is reasonably expected to be safe which could prevent the marketing of such dietary ingredient. Thus, it is in Defendants' interests to maintain that DMAA is "natural" so that they can avoid FDA scrutiny.

20. The Dietary Supplement Safety Act (S. 3002) (the "Act"), which was introduced in February 2010, would repeal the DSHEA provision that allows the sale of all dietary ingredients sold in dietary supplements marketed in the U.S. before October 14, 1994, and would only allow the sale of those dietary ingredients included on a list of Accepted Dietary Ingredients issued by the FDA. The Act would allow the FDA to recall any dietary supplement it deems to have a "reasonable probability" of causing serious adverse health consequences or that are misbranded. The Act would also require distributors to provide the FDA with a list of ingredients and copies of supplement labels, updated annually, before marketing a supplement product.

21. As noted by GNC in the 10-K, passage of the Act could "severely restrict the number of dietary supplements available for sale and increase our costs and potential penalties associated with selling dietary supplements."

22.     While no specific products were identified in the 10-K, C-4 Extreme, which produces substantial revenue via retail store and Internet sales, would be subject to the Act.   If that occurs, the costs to GNC and Cellucor would be enormous, both by virtue of lost sales and the FDA's ability to impose a fine of twice the gross profits earned by Defendant on sales of supplements that are found to violate the law.   Therefore, in anticipation thereof, Defendants have recently taken some steps to address issues raised about possible negative effects of DMAA. But those steps are too little and too late.   For example, Defendants have noted, on the packaging of some C-4 Extreme that because of the "unique restrictions of amateur and professional sports organizations" athletes who use C-4 Extreme should check with their sporting organizations before taking the product.   Of course, such a suggestion gives no indication about the legality or safety of C-4 Extreme and its ingredients.

23.     Although Defendants have been extremely successful with the marketing, sale and distribution of C-4 Extreme, their success has been based on false, misleading and deceptive advertising.   Defendants sell C-4 Extreme through a deceptive marketing campaign, claiming that C-4 Extreme is a safe dietary supplement.   The labeling for C-4 Extreme prominently states that it is a "Dietary Supplement."   However, C-4 Extreme does not qualify as a dietary supplement.

24.    The Food Drug and Cosmetics Act ("FDCA") defines a dietary supplement as a "product (other than tobacco) intended to supplement the diet" that contains one or more enumerated "dietary ingredients." *See* 21 U.S.C. §321(ff)(1). The dietary ingredients in such "supplements" may include a number of enumerated naturally occurring substances; such as vitamins, minerals, herbs or other botanicals, amino acids and such substances such as enzymes, organ tissues, glandulars and metabolites.   Dietary supplements can also be extracts or concentrates. *Id.*

25.    The DMAA contained in C-4 Extreme is a synthetic product that is illegal and dangerous, but that is undisclosed by Defendants.   DMAA is an adulterant and any products, like C-4 Extreme, that contain DMAA are adulterated and are therefore on the market unlawfully given the terms of the FDCA.   This is so for the following reasons:

> (1)    DMAA is not a dietary ingredient because it has no established history in the food supply; it is not a dietary substance for use by man to supplement the diet by increasing the total dietary intake; and is not a concentrate, metabolite, constituent, extract, or combination of any vitamin, mineral, herb or other botanical, amino acid or other dietary substance for use by man to supplement the diet by increasing the total dietary intake. 21 U.S.C. § 321.  As a result, it cannot be sold as

a dietary supplement[1] pursuant to the FDCA.  21 U.S.C. § 321(ff) (1)(F).  *See* Section IV.D.2 of the "Draft Guidance for Industry: Dietary Supplements: New Dietary Ingredient Notifications and Related Issues" (July 2011);

(2)   Even if DMAA was extracted from the geranium plant (which claim is clinically unsupported), it would be considered "adulterated" under the FDCA  21 U.S.C. § 350 (a) (1).  It cannot be sold as a dietary supplement because it is not present in the food supply as an article used for food which has not be chemically altered; and

(3)   Even if DMAA was a dietary ingredient (which it is not), it constitutes a "new dietary ingredient" under the FDCA because it was not marketed as a dietary ingredient before October 15, 1994, it has also not undergone the New Dietary Ingredient Notification.  21 U.S.C. § 350 (b).

---

[1]   DSHEA was enacted to amend the Federal Food, Drug, and Cosmetic Act in order to, *inter alia*, establish standards with respect to dietary supplements.  *See* Section 201(ff) of DSHEA (21 U.S.C. § 321) was amended by adding the following. A "dietary supplement":

"(1) means a product (other than tobacco) intended to supplement the diet that bears or contains one or more of the following dietary ingredients:

"(A) a vitamin;

"(B) a mineral;

"(C) an herb or *other botanical*;

"(D) an amino acid;

"(E) a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or

"(F) a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D), or (E).

26.   Studies have shown that DMAA is *not* a natural constituent of the geranium plant, and that all DMAA is synthetic.  In fact, NSF International, a world leader in standards development and product certification for over 65 years, and widely recognized for its scientific and technical expertise in product certification, has publicly stated that it has tested geranium oil down to a parts per billion screen, and DMAA is not derived from natural geranium oil; it is a synthetic compound and not a natural constituent of the botanical geranium.  Further, experts in the industry have become concerned that this potent stimulant drug will lead to serious health issues and even death.

27.   DMAA has extremely dangerous side effects.  Experts have noted that DMAA has a chemical structure similar to amphetamine and ephedrine and can cause increases in heart rate and blood pressure and even death.

28.   The safety concerns associated with DMAA have been well-documented, including concerns that DMAA is a dangerous and possibly addictive substance that can cause headache, nausea and stroke.

29.   Experts' concerns about DMAA parallel the concerns over ephedrine which caused the death of Baltimore Orioles pitcher Steve Bechler.

30.   The DMAA health concerns are sufficiently serious that, on December 3, 2011, the United States military removed all products that contain DMAA from all Army and Air Force Exchange Service and Navy Exchange stores.   This

CLASS ACTION COMPLAINT

occurred after soldiers believed to have used products containing DMAA suffered heat stroke, organ failure and/or heart attacks during training. These incidents caused the Army to launch an "ongoing safety review after recording a number of other serious health effects among known and potential users of products containing DMAA including kidney and liver failure, seizures, loss of consciousness, heat injury and muscle breakdown during exertion, and rapid heartbeat." http://www.stripes.com/news/army-probing -connection-between-body-building-supplement-2-deaths-1.163552.

**Positive Sports Drug Tests Caused by Supplements Containing Methylhexaneamine**

31. The World Anti-Doping Agency (WADA), currently headquartered in Montreal, Canada, was formed to coordinate the anti-doping efforts of sport organizations and governments worldwide. The WADA board consists of equal numbers of government and sport representatives.

32. One of the important efforts of WADA was, after extensive consultation, to publish the World Anti-Doping Code (the "Code"). This Code established a common set of anti-doping rules applicable to sport worldwide. The Code was first published in 2003, and was revised in 2009. To date, more than 600

sport organizations have adopted the Code and incorporated the provisions of the Code into their own regulations.[2]

33.    Pursuant to the Code, WADA annually adopts a list of substances which are prohibited in Olympic sports throughout the world (the "WADA Prohibited List").

34.    WADA also accredits sports drug testing laboratories which meet its standards.

35.    Although the major U.S. professional sports leagues are not governed by the Code, most sports leagues around the world, including Major League Baseball, the National Basketball Association, and the National Football League use WADA accredited laboratories and prohibit their players from using all or most of the substances on the WADA Prohibited List.

36.    Because most governments are precluded by their constitutional makeup from adopting the Code directly, a UNESCO Convention, entitled the International Convention Against Doping in Sport, was created as a vehicle by which governments could commit to give their support to the Code.  The United States ratified the International Convention Against Doping in Sport on August 4, 2008.  To date, the Convention has been ratified by 131 governments, including all

---

[2]    The Code can be found at http://www.wada-ama.org/en/World-Anti-Doping-
*(footnote con't. on next page)*

of the major international sporting powers.  By ratifying the UNESCO Convention, the United States agreed to adopt appropriate measures consistent with the principles of the Code (Article 3(a)) and to take appropriate measures, including legislation, regulation, policies or administrative practices to implement that commitment (Article 5).  Specifically, governments ratifying the Convention have agreed to restrict the availability and use in sport of prohibited substances and methods (Article 8).

37.    The use of performance-enhancing drugs, particularly by young people, is a serious national health issue in the United States.  A recent study funded by the National Institute on Drug Abuse found that more than 2% of all high school seniors had used steroids and the illegal abuse of all pharmaceutical drugs is a growing crisis.

38.    Major players in the supplement industry in the United States, including Defendants, have played a significant role in facilitating access by U.S. consumers, including youth, to synthetic drugs marketed as natural, nutritional supplements.

Program/Sports-and-Anti-Doping-Organizations/The-Code/.

39.     Supplement manufacturers, including Defendants, seek to increase their sales by promoting their products to athletes and by associating themselves with positive images associated with athletics.

40.     For example, sales of the testosterone precursor, Androstenedione increased 1000% after a journalist reported seeing a bottle of the substance in Mark McGwire's locker.  Many of these new users were adolescents.[3]  Androstenedione was subsequently added to the list of controlled steroids.

41.     However, many supplements, including those marketed by Defendants, contain substances on the WADA Prohibited List and put athletes at risk for a positive drug test.

42.     Supplement manufacturers such as Defendants are aware that their products are regularly consumed by athletes and Defendants actively market their products to athletes, generally without warning them of the risks of a positive drug test.

43.     To the extent, as described below, that lawsuits by athletes who have experienced positive drug tests as a result of using products containing methylhexaneamine have caused Defendants to include warnings on their labels that the products may cause a positive test under sport testing rules, these warnings

are insufficient to warn athletes and other consumers of the true nature of these products and the substantial health risks associated with these products.

44.     Even if a supplement label warns that the product may be prohibited under sport anti-doping rules, such a warning does not provide any notice to the general public of the product's dangerous and non-natural properties.

45.     Moreover, because substances prohibited in sport are not always prohibited at all times (*e.g.*, many substances are prohibited only "in competition") and prohibited substances can be naturally occurring, a warning that a supplement may contain substances prohibited in sport does not necessarily provide any indication that the substance is dangerous or that it is not a natural substance.

**DMAA Has Been Misrepresented by Defendants to be a Natural Substance**

46.     Despite Defendants' representations otherwise, DMAA is not a natural substance. Defendants have managed to convince the public that it is, but a variety of studies have demonstrated their claims to be untrue.

47.     The American Herbal Products Association ("AHPA") was founded in 1982 by a group of companies that were active in the botanicals trade. It is now the trade association for, and "voice" of the herbal products industry, being comprised of foreign and domestic companies doing business as growers, importers,

---

[3]     See, e.g., "ESPN Special Report,

*(footnote con't. on next page)*

processors, manufacturers, marketers and distributors of botanical products.  The organization's purpose is to promote the economic health of the herbal products industry and to help deliver high quality products to consumers.

48.   At its July 13, 2011 meeting, AHPA's Board of Trustees approved a motion to create a trade requirement regarding the labeling of 1, 3-dimethylpentylamine.  AHPA's Sports Nutrition Committee suggested this requirement to the Board because DMAA had been listed on product labels as derived from "geranium oil" or other parts of the plant, "despite inconclusive evidence that the constituent is found in the species."  The motion, as passed was as follows:

> **MOTION** to establish a trade requirement that AHPA members do not label 1,3-dimethylpentylamine, whether identified by this name or any synonym, as geranium oil or as any part of the geranium plant, whether by the common name of geranium or by the botanical name of any plant known as geranium; except that, nothing in this policy prevents labeling of any compound that is in fact derived from geranium plant materials by that compound's common or usual name.

49.   In July 2011 Health Canada (the Canadian equivalent of the FDA) announced that the Natural Health Products Directorate ("NHPD") and Therapeutic

http://sports.espn.go.com/espn/eticket/story?page=steroids&num=8.

1   Products Directorate ("TPD") determined that products containing DMAA must be

2   authorized as drugs.

3

4       50.   Health Canada noted that the single analysis by Chinese researchers in

5   a paper published in 1996 and published in the Journal of Guizhou Institute of

6   Technology ("Guizhou Paper"), is the only support for the contention that DMAA

7

8   is a constituent of geranium oil.   Not only has no other published article reported

9   the presence of DMAA, but at least seven other papers failed to identify DMAA in

10

11  geranium oil.   In addition, the Canadian authorities determined that the Guizhou

12  Paper contains "errors."  Health Canada said that:

13

14          NHPD and TPD have jointly concluded that there is no
            credible scientific evidence that DMAA is captured as an
15          isolate of a plant [...] and therefore cannot be classified as
16          an NHP [natural health product].

17          In addition, DMAA is not considered to be an acceptable
            non-medicinal ingredient in drugs or NHPs or as a food
18          additive due to its pharmacological activity.

19      51.   As a result, any product containing DMAA requires authorization by

20

21  Health Canada as a drug in order to be legally sold in Canada.

22      52.   Following the Health Canada announcement, the general manager of

23

24  dietary supplements programs at NSF International (an accredited third-party

25  certification body) said that Health Canada's classification of DMAA as a drug was

26  not surprising, given the synthetic ingredient's history of use as an active

27

28  pharmaceutical ingredient and not as a dietary ingredient.

CLASS ACTION COMPLAINT                                          Page 20

53.     In a November 4, 2011 article entitled "Studies of Methylhexaneamine in Supplements and Geranium Oil", published by John Wiley & Sons, Ltd., four scientists, at least three of whom have been affiliated with the WADA accredited laboratory in Australia, published a paper about DMAA (the "Study").   After conducting a scientific study which is described in detail in the article, the Study concluded that "geranium oils do not contain methylhexaneamine and that products labeled as containing geranium oil but which contain methylhexaneamine can only arise from the addition of synthetic material."

54.     The Study cites the WADA Explanatory Notes on the 2011 Prohibited List.  http://www.wada-ama.org/Dcouments/World_Anti-Doping_Program/WADP-Prohibited_List_EN.pdf (July 2011) which says:

> The stimulant 'methylhexaneamine' (which may be described like many other substances, by other chemical names) is now included in the Prohibited List as a Specified Substance.   This substance is now often marketed as a nutritional supplement and may frequently be referred to as 'geranium oil' or 'geranium root extract.'

55.     The Study explains that the above statement originated from a belief that geraniums contain DMAA "based on what appears to be a single report in the literature." That "single report" was the Ghizou Paper.  The Study authors explain that the Ghizou Paper was "incorrect or possibly incorrectly translated," and provides the science to support why the Guizhou Paper is wrong.

CLASS ACTION COMPLAINT

56.   The Study states not only that geranium oil does not contain methylhexaneamine, but that the use of Geranimine for the compound appears to have been a "marketing ploy which has resulted in a large number of athletes returning adverse findings."

## DEFENDANTS' ACTIONS REGARDING C-4 EXTREME

57.   GNC is recognized as a major force in the vitamin and supplement industry.  GNC describes itself as the leading specialty retailer for health and wellness products including, among other items, sports nutrition/supplement products.  It derives revenue from product sales at its company-owned retail stores, third party contract manufacturing, franchises, e-commerce and corporate partnerships.  As stated in the 10-K, "GNC believes that the strength of our GNC brand, which is distinctively associated with health and wellness, combined with our stores and website, give us broad access to consumers and uniquely position us to benefit from the favorable trends driving growth in the nutritional supplements industry and broader health and wellness sector."  In 2010, GNC had U.S. retail revenue of $1.293 billion, $531.3 million of which was from sports nutrition products.  GNC has been selling products on its website since 2005 which, in addition to increasing its overall sales, enables GNC to market and sell products where it has no retail operations.

58.     The 10-K addresses GNC's business and products and the fact that customers "widely credit us as being a leader in offering premium quality health products and rate the availability of a wide variety of products as being one of our biggest strengths."  GNC said that it works with its vendors in order to provide third-party products with preferred distribution rights available to GNC for a certain period of time.

59.     Cellucor's Facebook page says that its distribution platform allows it to "incubate, formulate, market and ship new products" to the 3500 retailers to which Woodbolt International distributes in a very short period of time.

60.     GNC and Cellucor work as a team to promote and sell Cellucor's products, including C-4 Extreme, which benefits both of them.  The two companies are so intertwined that Cellucor's website includes a form for GNC Franchise Employee information. http://www.cellucor.com/page/gnc-franchisees.

61.     All Defendants have sold, marketed, distributed and or made C-4 Extreme during the Class Period (defined in paragraph ___ below), while falsely representing it to be healthy and safe when it is not, and when they had no basis to represent C-4 Extreme as a dietary supplement containing natural ingredients.

62.     For example, Cellucor's website, http://cellucor.com, represents that: "Since inception, the Cellucor brand has pursued a policy of quality, integrity and persistent innovation centered around one mission: To deliver the best results

possible while simultaneously improving the customer's life."  Cellucor explains that "Each and every unit undergoes strenuous quality testing to ensure potency, consistency and most important, safety."  It refers to Cellucor's "elite status" in the supplement business, says that "science serves as the foundation of our success" and talks about its "exhaustive approach to research and development.  Cellucor says that its customers are "some of the most discriminating in the industry" who "research labels" and live on strict nutrition diets.  During the Class Period, thousands of containers of C-4 Extreme have been sold in GNC stores and over the Internet by GNC and Cellucor.

63.   On   February   17,   2011,   http://bodybuilding supplementinformation.com/2011/02/cellucor-c4/  reported   that   Cellucor   had "removed 1, 3-Dimethylamylamine (Geranium) from C4".   However, a thread posted on bodybuilding.com indicates that C-4 Extreme contained DMAA as of July 2011.  Further, C-4 Extreme containing DMAA continues to be sold at GNC stores and over the internet.

64.   On February 22, 2011, the NUTRA ingredients-usa.com website, which provides daily news on nutritional supplements, energy drinks, sports nutrition and vitamins, said that an "unauthorized synthetic form of geranium oil-known as 1,3 dimethlypentylamine-remains on-market in major-label dietary

supplements" and that some retailers were refusing to sell products containing 1.3 dimethlypentylamine."

66. NUTRA also said that major retailers like GNC were continuing to freely sell products with this ingredient though it can be "difficult to determine if they are geranium extracts or synthetically derived." NUTRA also reported that shortly after publication of its story, a GNC spokesperson said that "GNC strictly complies with all applicable statutes and regulations, and requires its vendors to represent and warrant that the products they sell do as well."

66. An August 15, 2011 posting on The PostGame website, found on Yahoo Sports, said that :

> Health experts and anti-drug enforcers are scrambling to
> warn athletes and the general public about a potentially
> dangerous supplement ingredient with a harmless name:
> Geranium.

> But this isn't a pink or purple flower from Martha
> Stewart's garden. When geranium is found on a
> supplement container, experts say, it's likely a stimulant
> that can cause heart trauma-especially in the extreme
> temperatures sweeping the country this summer.

67. On September 21, 2011, in a blog posting by "CELLUCOR CEO" (Doss Cunningham is the Chief Executive Officer of Cellucor and Woodbolt Distribution and has been since 2007, having joined company management in 2004), Cellucor pronounced 2011 the 'Year of C4', observing that since its "official

launch" in January 2011, it "exploded on to the sports nutrition scene, converting countless fans and receiving numerous honors."

68.     In another blog post by "CELLUCOR CEO" on October 20, 2011, Cellucor announced its excitement to "partner" with GNC, explaining that they had "'teamed up' to launch the largest  pre-workout giveaway in GNC history" when, beginning November 1, they would give away 600,000 5-serving trials of C-4 Extreme with a qualifying purchase.

69.     However, while Cellucor may have decided to take some action regarding DMAA, it certainly has not removed all DMAA products from the market.   While there are reports that Cellucor's most current iteration of C-4 Extreme has reportedly replaced DMAA with "Synephrine HCL" (which is on USADA's "Monitoring" list), C-4 Extreme product containing DMAA continues to be sold by Cellucor and GNC.   In fact, the C-4 Extreme 60-serving Fruit Punch product containing DMAA continues to appear for sale on GNC's website and in retail stores.

70.     Moreover, "Synephrine HCL" is believed to be a synthetic stimulant with dangerous properties similar to DMAA.   Thus, even if Cellucor has switched synthetic stimulants to be included in later versions of C-4 Extreme, this change has not corrected the misrepresentations to consumers identified in this Complaint.

71.     C-4 Extreme is listed on GNC's website in its "Top Sellers" and is believed to be used by thousands of people across the U.S.

72.     However, DMAA has been proven to be dangerous and present a substantial risk of serious bodily injury to consumers who use them because contrary to representations about the products, they are not natural products but are synthetically produced stimulants with serious unadvertised side effects.

## CLASS ACTION ALLEGATIONS

73.     Plaintiff brings this class action for injunctive relief, restitution and other equitable and monetary relief on behalf of a class consisting of:

> All persons in the United States who purchased C-4 Extreme at any time during the four years prior to the date of the filing of this Complaint through the present (the "Class").

74.     Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries and assigns.

75.     The proposed Class is so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, however, Plaintiff believes that the total number of Class members is at least in the tens of thousands and members of the Class are numerous and geographically dispersed. While the exact number and identities of the Class members are

unknown at this time, such information can be ascertained through appropriate investigation and discovery.  The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

76.    There is a well-defined community of interest in the questions of law and fact underlying the claims of each member of the Class, and these common questions predominate over any questions that may affect individual Class members.  The common questions of fact and law include, but are not limited, the following:

a.    Whether the marketing, advertising, packaging, labeling and others promotional materials for DMAA were deceptive;

b.    Whether Defendants' claims regarding C-4 Extreme's efficacy, safety and legality are accurate;

c.    Whether Defendants have falsely represented that C-4 Extreme has uses and benefits which it does not have;

d.    Whether Defendants knew that their claims regarding C-4 Extreme's efficacy, safety and legality were false and/or misleading;

e.    Whether Defendants' conduct constitutes a violation of the Consumers Legal Remedies Act;

f.    Whether Defendants' conduct constitutes a violation of California's false advertising law;

g.    Whether Defendants' conduct constitutes an unfair, unlawful and/or fraudulent business practice in violation of California's unfair competition law;

h.    Whether Defendants breached express and/or implied warranties;

i.    Whether Defendants were unjustly enriched;

j.    Whether Defendants' conduct as set forth herein injured consumers, and if so, the extent of the injury;

k.    Whether Plaintiff and Class members are entitled to compensatory damages, and if so, the nature of such damages; and

l.    Whether Plaintiff and the Class Members are entitled to declaratory and injunctive relief.

77.    Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and all members of the Class have been similarly affected by Defendants' common course of conduct.

78.    Plaintiff will fairly and adequately represent and protect the interests of the Class in that they are typical purchasers of C-4 Extreme. Plaintiff has retained competent counsel with substantial experienced in handling complex class action

litigation. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class.

79.     Certification of this class is appropriate because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims and provides substantial benefits.

80.     Absent a class action, it would be highly unlikely that Plaintiff or any other members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits would exceed their expected recovery.

81.     Certification is also appropriate because Defendants acted or refused to act on grounds generally applicable to the class, thereby making appropriate the relief sought on behalf of the Class as a whole. Further, given the large number of consumers who purchased C-4 Extreme, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

82.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the

1   duplication of discovery, effort, expense and burden on the courts that such

2   individual actions would engender.  The benefits of proceeding as a class action,

3

4   including providing a method for obtaining redress for claims that would not be

5   practical to pursue individually, outweigh any difficulties that might be argued with

6

7   regard to the management of this class action.

8   **CAUSES OF ACTION**

9   **FIRST CAUSE OF ACTION**

10  **VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT**

11  **(CAL. CIV. CODE §1750 *et. seq.*)**

12  **(On Behalf of Plaintiffs and the Class Against All Defendants)**

13       83.     Plaintiff incorporates by reference all the above allegations as if fully

14  set forth herein.

15

16       84.     Plaintiff and each class member is a "Consumer" as that term is

17  defined by Cal. Civ. Code §1761(d).

18

19       85.     Cellucor C-4 is a "Good" as that term is defined by Cal. Civ. Code

20  §1761(a).

21

22       86.     Defendants are "Persons" as defined by Cal. Civ. Code §1761(c).

23       87.     The transaction involved herein is a "Transaction" as defined by Cal.

24  Civ. Code §1761(e).

25

26       88.     Plaintiff and members of the Class are individuals who have purchased

27  C-4 Extreme for personal use.  This cause of action is being asserted on behalf of

28

1   Plaintiff and the Class members who purchased C-4 Extreme within the applicable

2   statute of limitations period for this claim.

3

4        89.    Plaintiff has standing to pursue this cause of action because Plaintiff

5   has suffered injury in fact and has lost money or property as a result of Defendants'

6

7   actions as set forth herein.   Specifically, Plaintiff purchased C-4 Extreme for her

8   personal and family use in reliance on Defendants' marketing claims with respect to

9   its efficacy, safety and legality.   Plaintiff and her family used C-4 Extreme as

10

11  directed but it did not work as advertised and was not of the quality and standard

12  advertised by Defendants.

13

14       90.    Defendants have engaged in, and continue to engage in, business

15  practices in violation of California Civil Code §1750 *et. seq.* (the "Consumers Legal

16

17  Remedies Act") by making false and unsubstantiated representations concerning the

18  efficacy, safety and legality of C-4 Extreme.   These business practices are

19  misleading and/or likely to mislead consumers and should be enjoined.

20

21       91.    Defendants have engaged in deceptive acts or practices intended to

22  result in the sale of C-4 Extreme in violation of Civil Code §1770.   Defendants

23

24  knew and/or should have known that their representations of fact concerning the

25  efficacy, safety and legality of C-4 Extreme were material and likely to mislead the

26  public. Defendants affirmatively misrepresented that C-4 Extreme was of a certain

27

28  standard and quality with certain benefits which it did not have.

92.     Defendants have represented that C-4 Extreme has characteristics, uses, benefits or qualities that it does not have.  The policies, acts and practices heretofore described were intended to result in the sale of C-4 Extreme, to the consuming public, particularly consumers seeking to rapidly build muscle strength, and thus Defendants have and continue to violate California Civil Code §1770.

93.     Defendants' conduct alleged herein violates the Consumers Legal Remedies Act, including but not limited to, the following provisions: (1) using deceptive representations in connection with goods or services in violation of Civil Code §1770(a)(4); (2) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have in violation of Civil Code §1770(a)(5); (3) representing that goods or services are of a particular standard, quality or grade, if they are of another in violation of Civil Code §1772(1)(7); and/or (3) advertising goods or services with intent not to sell them as advertised in violation of Civil Code §1770(a)(9).

94.     Defendants' practices, acts and course of conduct in connection with their promotion and sale of C-4 Extreme, as described above, are likely to mislead a reasonable consumer acting reasonably under the circumstances to his or her detriment.  Like Plaintiff, members of the putative Class would not have purchased C-4 Extreme if Defendants had disclosed the truth and all facts concerning C-4 Extreme.

95.     Plaintiff and members of the putative Class have each been directly and proximately injured by the conduct of Defendants.

96.     In conjunction with filing this action, Plaintiff's Counsel mailed to Defendants, by certified mail, return receipt requested, the written notice required by Civil Code §1782(a).  Should Defendants fail to respond within thirty days, Plaintiff will amend to seek damages under the California Consumer Legal Remedies Act.

97.     Defendants' wrongful business practices constituted and constitute, a continuing course of conduct in violation of the Consumers Legal Remedies Act since Defendants are still representing that C-4 Extreme has characteristics, uses, benefits and abilities which are false and misleading and have injured Plaintiff and the Class.

**SECOND CAUSE OF ACTION**
**VIOLATION OF FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE §17500, *et seq.*)**
**(On Behalf of Plaintiffs and the Class against all Defendants)**

98.     Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

99.     Plaintiff and the Class have standing to pursue this cause of action because Plaintiff and the Class have suffered injury in fact and lost money as a result of Defendants' actions as set forth herein.  Specifically, Plaintiff and the Class purchased C-4 Extreme in reliance on Defendants' marketing claims.

Plaintiff and the Class used C-4 Extreme as directed, but it did not work as advertised and did not provide any of the promised benefits.

100. Defendants have engaged in false advertising as they have disseminated false and/or misleading representations about C-4 Extreme.

101. Defendants knew or should have known by exercising reasonable care that their representations were false and/or false misleading. During the Class Period, Defendants engaged in false advertising in violation of Cal. Bus. & Prof. Code §1750, *et seq.*, by misrepresenting in its advertising and marketing of C-4 Extreme to Plaintiff, Class members and the consuming public that C-4 Extreme is effective, safe and legal.

102. Each of the aforementioned representations alleged in this Complaint was false and/or misleading because C-4 Extreme is not of the standard, quality or grade-advertised and is in reality unsafe, ineffective and illegal.

103. By disseminating and publishing these statements in connection with the sale of C-4 Extreme, Defendants have engaged in and continue to engage in false advertising in violation of Bus. & Prof. Code §17500, *et seq.*

104. As a direct and proximate result of Defendants' conduct, as set forth herein, Defendants have received ill-gotten gains and/or profits, including but not limited to, money. Therefore, Defendants have been unjustly enriched. Pursuant to Cal. Bus. & Prof. Code §17535, Plaintiff seeks injunctive relief, restitution and

disgorgement of Defendants' ill-gotten gains as specifically provided in Cal. Bus. & Prof. Code §17535.

105.    Plaintiff and Class members seek to enjoin Defendants from engaging in these wrongful practices, as alleged herein, in the future.   There is no other adequate remedy at law and if any injunction is not ordered, Plaintiff and the Class will suffer irreparable harm and/or injury.

### THIRD CAUSE OF ACTION
### VIOLATION OF UNFAIR COMPETITION ACT
### (Cal. Bus. & Prof. Code §17200, *et seq.*)
### (On behalf of Plaintiffs and the Class against all Defendants)

106.    Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

107.    Plaintiff has standing to pursue this cause of action because Plaintiff has suffered injury in fact and lost money as a result of Defendants' actions as set forth herein.    Specifically, Plaintiff purchased C-4 Extreme in reliance on Defendants' marketing claims.  Plaintiff used C-4 Extreme as directed, but it did not work as advertised and was not of the standard, quality and grade advertised.

108.    Defendants' actions as alleged in this Complaint constitute an unfair or deceptive business practice within the meaning of California Business and Professions Code §17200, *et seq.*, in that Defendants' actions are unfair, unlawful and fraudulent and because Defendant has made unfair, deceptive, untrue or

misleading statements in advertising media, including the Internet, within the meaning of California Business and Professions Code §17200, *et seq.*

109.   In advertising and packing C-4Extreme, Defendants make false and misleading statements concerning C-4 Extreme, and refuse to reveal true facts. Defendants do not have the requisite competent and reliable scientific evidence to support the claims about C-4 Extreme made in Defendants' advertising and packaging.

110.   Defendants' fraudulent and unfair business practices have caused economic injury to Plaintiffs and the putative Class.

111.   Defendants' business practices, as alleged herein, are unlawful because they violate the Consumers Legal Remedies Act and False Advertising Law., as set forth herein

112.   Defendants knew or should have known by exercising reasonable care that its representations were false and/or misleading.   During the Class Period, Defendants engaged in unfair, unlawful and fraudulent business practices in violation of California Business and Professions Code §17200, *et seq.*, by misrepresenting in its advertising and marketing of C-4 Extreme to Plaintiff, Class members and the consuming public that, C-4 Extreme was effective, safe and legal.

113.    Each of the aforementioned representations alleged in this Complaint was false and misleading because C-4 Extreme was not of the standard, quality or grade advertised, and are in reality both unsafe and illegal.

114.    Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct of unfair competition since Defendants are marketing and selling C-4 Extreme in a manner likely to deceive the public.

115.    As a direct and proximate result of Defendants' wrongful business practices in violation of Business and Professions Code §17200, *et seq.*, Plaintiff and members of the Class have suffered economic injury by losing money as a result of purchasing C-4 Extreme.  Plaintiff and members of the Class would not have purchased or would have paid less for C-4 Extreme had they known that it was not as represented.

116.    Pursuant to Business and Professions Code §17203, Plaintiff and the Class seek an order of this Court enjoining Defendants from continuing to engage in unlawful, unfair or deceptive business practices and any other act prohibited by law, including those set forth in the Complaint.  Plaintiff and the Class also seek an order requiring Defendant to make full restitution of all money they wrongfully obtained from Plaintiff and the Class.

**FOURTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**(Cal. U. Comm. Code §2314 and common law)**
**(On Behalf of Plaintiffs and the Class against all Defendants)**

117.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

118.   This cause of action is being asserted on behalf of Plaintiff and the putative Class members who purchased C-4 Extreme within the applicable statute of limitations period for this claim.

119.   C-4 Extreme was sold with the implied warranty of merchantability in that the product would pass without objection in the trade, is fit for the ordinary purpose for which it is used, is adequately contained, packaged and labeled and conforms to the promises or affirmations of fact made on the container and label. C-4 Extreme does not meet the foregoing criteria.

120.   The defects in C-4 Extreme existed prior to delivery of the C-4 Extreme to Plaintiff and the Class members.  Plaintiff provided Defendants with notice of her warranty claims, on behalf of herself and the Class members, by virtue of a notice letter sent to Defendants on February 15, 2012.  Defendants have failed to fulfill their warranty obligations despite said notice.  Plaintiff and the Class has incurred damages as described herein as a direct and proximate result of the defective C-4 Extreme and Defendants' breach of the implied warranties, in that Plaintiff and the Class have paid the purchase price for the defective C-4 Extreme.

1  Plaintiff, on behalf of herself and the Class members, has requested that Defendants

2  correct the defects and Defendants have refused.  Plaintiff and the Class members

3

4  are entitled to refund of the purchase price paid for the C-4 Extreme, consequential

5  and incidental damages, costs and expenses, including attorney's fees.

6

7  ### FIFTH CAUSE OF ACTION
   ### BREACH OF EXPRESS WARRANTY
8  ### (Cal. U. Comm. Code §2313)
   ### (On Behalf of Plaintiff and the Class against all Defendants)

9

10     121.   Plaintiff incorporates by reference all the above allegations as if fully

11
   set forth herein.
12

13     122.   This cause of action is being asserted on behalf of Plaintiff and the

14
   Class members who purchased C-4 Extreme within the applicable statute of
15

16  limitations period for this claim.  C-4 Extreme was sold with an express warranty,

17
   as Defendants made promises and affirmations of fact regarding the muscle-
18

19  building properties of C-4 Extreme, as well as the nature, safety and efficacy of C-4

20  Extreme.

21
       123.   C-4 Extreme was sold with an express warranty because Defendants'
22

23  descriptions on the labeling and in advertising were intended to become part of the

24
   basis for the bargain.  C-4 Extreme is not suitable for the purpose for which it was
25

26  required and sold as C-4 Extreme is not in fact a safe and effective dietary

27  supplement, and does not in fact cause or promote muscle building.

28

124.   The defects in C-4 Extreme existed prior to the delivery of the C-4 Extreme to Plaintiff and the Class members.

125.   Plaintiff, on behalf of herself, and the Class members, provided Defendants with notice of their warranty claims by virtue of the letter sent to Defendants on February 15, 2012.   Defendants failed to fulfill their warranty obligations despite said notice.

126.   Plaintiff and the Class members have incurred damages as described herein as a direct and proximate result of the defective C-4 Extreme and Defendants' breach of the express warranties, in that Plaintiff and the members of the Class have paid the purchase price for a defective product.   Plaintiff, on behalf of herself and the Class members, requested that Defndants correct the defect and refund amounts paid for the defective product, and Defendants have refused. Plaintiff and the Class members are entitled to a refund of the purchase price of the C-4 Extreme, consequential and incidental damages, and costs and expenses including attorneys' fees.

**SIXTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class against all Defendants)**

127.   Plaintiff incorporates by reference all the above allegations as if fully set forth herein.

128.   This cause of action is being asserted on behalf of Plaintiff and the Class members who purchased C-4 Extreme within the applicable statute of limitations period.

129.   Defendants have benefited and have been unjustly enriched by their wrongful conduct alleged hereinabove.  Defendants sold C-4 Extreme to Plaintiff and the members of the Class based upon deceptive conduct, omissions and misrepresentations as to uses and qualities which C-4 Extreme does not posses and which Defendants were, and still are, aware that it does not possess.

130.   Defendants have knowledge of this benefit and have voluntarily accepted and retained this benefit.

131.   The circumstances as described herein are such that it would be inequitable for Defendants to retain these ill-gotten benefits without paying the value thereof to Plaintiff and the Class members.

132.   Plaintiff and the Class members are entitled to the amount of Defendants' ill-gotten gains, including interest, resulting from Defendants' unlawful, unjust and inequitable conduct as described above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and members of the Class request that the Court enter an order or judgment against Defendants, and each of them as named in the future, as follows:

A.     Certification of the action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of Plaintiff as class representative and her counsel of record as class counsel;

B.     Equitable and injunctive relief as may be necessary to disgorge and/or restore monies received by Defendants as a result of the deceptive conduct alleged herein;

C.     Consequential and incidental damages as to the Fourth and Fifth Causes of Action only;

D.     Pre-judgment and post-judgment interest on such monetary relief;

E.     A declaration that Defendants' conduct as alleged herein was unlawful and an injunction barring Defendants from continuing the unlawful conduct described herein;

F.     The costs of bringing this suit, including reasonable attorneys' and expert fees; and

G.     All other relief to which Plaintiff and members of the Class may be entitled at law or in equity.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

1  Dated:  February 15, 2012

2

3                                    GLANCY BINKOW & GOLDBERG LLP

4

5                                    By:_____

6                                    Marc L. Godino
                                     1925 Century Park East, Suite 2100
7                                    Los Angeles, CA 90067
8                                    Tel: (310) 201-9150
                                     Fax: (310) 201-9160
9

10

11                                   Karin E. Fisch
                                     Stephanie Amin-Giwner
12                                   ABBEY SPANIER RODD & ABRAMS, LLP
13                                   212 East 39th Street
                                     New York, NY  10016
14                                   Tel.: 212-889-3700
15                                   Fax: 212-684-5191

16
                                     *Counsel for Plaintiff and the Class*
17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV12- 1336 ODW (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Lynette Bates | General Nutrition Centers, Inc., Cellucor Sports Nutrition, Woodbolt Distribution, Ltd., Woodbolt Management, LLC and Woodbolt International |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br><br>Marc L. Godino, GLANCY BINKOW & GOLDBERG LLP<br>1925 Century Park East, Suite 2100, Los Angeles, CA  90067<br>(310) 201-9150 | Attorneys (If Known) |

### II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. ORIGIN (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes  ☐ No        ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause.  Do not cite jurisdictional statutes unless diversity.)

28 U.S.C. §1332 (d)(2)(a)

### VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other . | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☑ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | REAL PROPERTY | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | IMMIGRATION | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

COPY

CV 12  1336

**FOR OFFICE USE ONLY:**   Case Number: _____

#### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No  ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
   ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
   ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
   ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
 ☐  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
 ☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | GNC: Delaware          Woodbolt Management: Texas<br>Cellucor: Texas          Woodbolt International: Texas<br>Woodbolt Distribution: Texas |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
 **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____  Date February 15, 2012

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |